USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __11/25/2013__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                  :

ARTHUR JOHNSON,                      :
                                  :
                 Plaintiff,    :       12 Civ. 4431 (KPF)
                                  :
           -v.-              :       OPINION AND ORDER
                                  :

THE CITY OF NEW YORK; POLICE OFFICER  :
JOHN DOE #972799; and POLICE OFFICER  :
JOHN DOE S #1-4,                :
                                  :
               Defendants.   :
                                  :
------------------------------------------------------------X

KATHERINE POLK FAILLA, District Judge:

      In June 2010, Plaintiff Arthur Johnson was arrested by the New York City Police Department (the "NYPD") on robbery and burglary charges. On March 15, 2011, the charges were dismissed. Fifteen months later, Plaintiff filed the instant lawsuit under 42 U.S.C. § 1983, alleging claims of false arrest and malicious prosecution — despite the fact that police officers involved in Plaintiff's arrest had, prior to making that arrest, interviewed the victim of the robbery and reviewed a surveillance video that showed Plaintiff (i) present at the approximate time and place of the robbery, (ii) with a woman who pled guilty to participating in the robbery, and (iii) being pursued by the victim. Defendant City of New York ("City"), the only defendant served in this case, now moves for a judgment on the pleadings.[1] For the reasons set forth in the

---

[1]    The defendants named in the Complaint as "Officer John Doe #972799" and "Officer John Doe[s] #1-4" have not been identified or served. As it happens, NYPD Detective Keith Opalick, who conducted the investigation into the robbery and participated in Plaintiff's arrest, has a similar, but not identical, Tax Registration Number. (*See*

remainder of this Opinion, the Court *sua sponte* converts the motion to one for

summary judgment, and grants that motion.

**FACTUAL BACKGROUND**

The following facts are taken from Plaintiff's Complaint, the security

video incorporated by reference in the Complaint,[2] matters of public record of

which the Court may properly take judicial notice (such as Plaintiff's arrest

report and relevant police records),[3] and the Declaration of Detective Keith

Opalick.  All of the facts contained herein are uncontroverted.

**A.    The April 3, 2010 Incident and Its Investigation**

The criminal charges against Plaintiff arose out of an April 3, 2010

incident at a residential hotel on West 45th Street in Manhattan (the "Hotel").

(Ex. E, F, G).  An elderly Hotel resident reported that an "unknown black male

attempted to and/or forcibly took something from him/her."  (Complaint

---

Declaration of Alison G. Moe in Support of Defendant's Motion for Judgment on the Pleadings (Dkt. #16), Exhibits C, F, G).  Detective Opalick confirmed these facts, and others, in a sworn declaration submitted in connection with this motion.  (*See* Ex. I to the Second Declaration of Alison G. Moe in Support of Defendant's Motion for Judgment on the Pleadings (Dkt. #28) ("Opalick Decl.")).

[2]   The parties do not dispute that the video, which is included as Exhibit B to the Moe Declaration, is incorporated by reference in the Complaint.  (Def. Br. 4-5; Pl. Opp. 2).  All references to this exhibit are to the specific camera (1, 9, or 12) and the specific time stamp in the video.

[3]   The Court may consider matters of which judicial notice may be taken under Fed. R. Evid. 201, including public records such as arrest reports, indictments, and criminal disposition data.  *Kramer* v. *Time Warner Inc.*, 937 F.2d 767, 773-75 (2d Cir. 1991) (holding that the Court may consider matters of which judicial notice may be taken under Fed. R. Evid. 201); *see also Awelewa* v. *New York City*, No. 11 Civ. 778 (NRB), 2012 WL 601119, at *2 (S.D.N.Y. Feb. 23, 2012) (judicial notice may be taken of arrest reports, criminal complaints, indictments, and criminal disposition data) (citing *Wims* v. *New York City Police Dep't*, No. 10 Civ. 6128 (PKC), 2011 WL 2946369, at *2 (S.D.N.Y. July 20, 2011)).  Contrary to Plaintiff's argument, *see* Pl. Opp. 2, where the Court takes judicial notice, it does so "in order to determine what statements [the public records] contained ... not for the truth of the matters asserted."  *Roth* v. *Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (internal quotation marks and emphases omitted) (quoting *Kramer*, 937 F.3d at 774).

("Compl.") ¶ 18).  Plaintiff was "allegedly seen leaving the building on the day of the alleged burglary/attempted robbery."  (Compl. ¶ 19).

According to a criminal complaint sworn out by NYPD Officer John South just after midnight on April 4, 2010, another Hotel resident, Velvet Volter, was arrested and charged with robbery and burglary offenses on April 3, 2010. (Ex. C).[4]  The criminal complaint against her contained the victim's account of the robbery incident.  (*Id.* at 1).  It also recited that another NYPD officer had viewed video surveillance of the incident, in which Volter and an "unapprehended male" were observed leaving the area near the victim's apartment just after the incident occurred, with the victim following after them. (*Id.* at 2).

The day after the robbery, on April 4, 2010, Detective Keith Opalick interviewed the 72-year-old female victim.  (Ex. F at 2).  The victim reported that two unknown perpetrators, at least one of whom was male and both of whom were black, punched her, shoved her head against the door of her apartment, and attempted to rob her, but took nothing.  (Ex. F at 2-5; Ex. G at 1-2).  The victim also related to Detective Opalick that, as the perpetrators left her apartment, she followed them down the hallway.  (Ex. G at 2).

In the course of Detective Opalick's investigation, he became aware that Volter was cohabitating with Plaintiff Johnson in the Hotel.  (Opalick Decl. ¶ 5). Detective Opalick also received a copy of an incident report, prepared on April

---

[4]     Except where otherwise noted, all references to page numbers in the Exhibits to the Moe Declaration are to the page numbers designated by ECF.

3, 2010, from representatives of the Hotel.[5]  (Ex. E; Opalick Decl. ¶ 7).  The report had been prepared by a company that provided security for the Hotel; it was later submitted to the NYPD and maintained as part of the police file.  (Ex. E).  The report related that the police had been contacted concerning the robbery incident; that the perpetrators of the incident had been identified as two "clients" at the Hotel, Velvet Volter and Arthur Johnson; and that one client (Volter) had been arrested that day.  (*Id.* at 1-2).  Detective Opalick subsequently obtained a picture of Plaintiff Johnson from police databases.  (Opalick Decl. ¶ 5).

On April 5, 2010, Detective Opalick and at least one other NYPD officer went to the Hotel to review the relevant surveillance footage.  (Ex. F at 3; Opalick Decl. ¶ 6).  According to his report, Detective Opalick observed two individuals in the video "leaving the area where the incident occurred while being followed by the [victim]" — Volter, whom Opalick knew had been arrested, and Plaintiff, whom Opalick tried without success to find later that day.  (Ex. F at 3).  Having compared the man in the video with the police photo of Plaintiff, Detective Opalick believed that the male in the videotape was in fact

---

[5]    In considering the record on the motion for judgment on the pleadings, the Court declined to take judicial notice of the security report, although it is a part of the police file concerning Plaintiff's arrest, because its accuracy was not readily verifiable.  *See* Fed. R. Evid. 201(b); *Toliver* v. *City of New York,* No. 10 Civ. 3165 (PAC) (JCF), 2013 WL 1155293, at *2 (S.D.N.Y. Mar. 21, 2013) (declining to take judicial notice of a witness affidavit and case history report because their accuracy was not readily verifiable).  However, having converted the motion to one for summary judgment, and upon consideration of Detective Opalick's Declaration, it is permissible for the Court to consider this report —not for the truth of the matter asserted, but to determine what the record contained.  *See id.*  Detective Opalick avers that he relied upon the security report in his investigation, and independently corroborated its contents (i.e., that Plaintiff was the man in the videotape) through police databases and review of the videotape.  (*See* Opalick Decl. ¶¶ 5-6).  In fact, Plaintiff concedes that he is the man in the videotape.  (Dkt. #25).

Plaintiff.  (Opalick Decl. ¶ 8).  The officers "canvassed the building asking if anyone recognized [Plaintiff] from the video."  (*Cf.* Compl. ¶¶ 19-21 (alleging that Plaintiff had been identified by others at the Hotel as "someone they knew but not anyone involved in the alleged burglary/robbery")).

The Court has reviewed the video surveillance footage.  (Ex. B).  A portion of that footage was taken by a camera near the doorway to the victim's apartment; it shows a black man and a black woman walking quickly down the hallway during the approximate time of the robbery.  (*Id.* at Camera 12, 17:25:47).  The woman is observed stopping and entering an apartment on the same floor as the victim's, while the man waits for her at the stairwell.  (*Id.* at Camera 12, 17:26:00-05).  The woman then rejoins the man and they disappear into the stairwell.  (*Id.*).  Shortly thereafter, an older, seemingly disoriented woman — the robbery victim — enters the hallway and attempts without success to follow the man and the woman.  (*Id.* at Camera 12, 17:26:10).

The man and the woman are observed several seconds later by a different security camera on a different floor, walking together through the hallway.  (Ex. B at Camera 9, 17:26:47).  A few moments later, they appear on still another camera, walking through the lobby together and leaving the hotel.  (*Id.* at Camera 1, 17:27:14).

**B.     Volter's Guilty Plea**

As noted, Velvet Volter was arrested on April 3, 2010, the same date as the robbery incident.  In her post-arrest statement, Volter informed her

arresting officer that "we knocked on the door and then I left." (Ex. C). Volter later admitted her involvement in the robbery and pled guilty to assault in the third degree on May 19, 2010. (Ex. D at 3). As part of her plea allocution, Volter answered "yes" to the question, "On April 3, 2010 at 1725 hours inside of 317 West 45th Street in New York County, did you slam a door into the complainant's head causing her to suffer substantial pain?" (*Id.*).

## C.   Johnson's June 11, 2010 Arrest

Detective Opalick communicated with the Assistant District Attorney ("ADA") handling Volter's prosecution while continuing his search for Plaintiff. (*See* Ex. F at 1, 4-5). On April 5, 2010, Detective Opalick issued an NYPD Investigation Card (or "I-Card") directing the arrest of Plaintiff; Plaintiff was subsequently arrested in Bronx County Criminal Court on June 11, 2010, where he was appearing in connection with an unrelated criminal matter. (Compl. ¶¶ 8, 9, 11; Opalick Decl. ¶ 9).[6]

---

[6]    The record is not clear as to whether Detective Opalick actually arrested Plaintiff. Detective Opalick avers that he "directed" the arrest of Arthur Johnson. (Opalick Decl. ¶ 9). However, Detective Opalick stated in Plaintiff's arrest report that "[o]n June 11, 2010, at approximately 1220 [hours] I did arrest the outstanding perp[etrator] regarding this robbery case. The perp[etrator] was picked up at approximately 1100 [hours] at his court appearance in the Bronx by Det. Monahan of the WAT team." (Ex. F at 4-5).

This discrepancy is immaterial for the purposes of this Opinion. Even if Detective Opalick were not the arresting officer, knowledge from his investigation can be imputed to the arresting officer(s) through the collective or imputed knowledge doctrine, which recognizes that "in light of the complexity of modern police work, the arresting officer cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a suspect is based on facts known only to his superiors or associates." *Zellner* v. *Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007) (quoting *United States* v. *Valez*, 796 F.2d 24, 28 (2d Cir. 1986); *see also Illinois* v. *Andreas*, 463 U.S. 765, 772 n.5 (1983) (finding, for purposes of probable cause analysis, that "where law enforcement authorities are cooperating in an investigation, ... the knowledge of one is presumed shared by all" (citing *Whiteley* v. *Warden*, 401 U.S. 560, 568 (1971))); *cf. United States* v. *Colon*, 250 F.3d 130, 135 (2d Cir. 2001) ("[A]n arrest ... is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or

On June 13, 2010, Plaintiff was charged with burglary of a dwelling causing injury, attempted robbery causing physical injury, and attempted robbery aided by another.  (Compl. ¶¶ 8-12; Ex. G).  A grand jury did not indict Plaintiff on these charges, however.  According to the Complaint, the charges were dismissed against Johnson on March 15, 2011.  (Compl. ¶ 15).

**D.    The Instant Litigation**

Plaintiff filed the instant action on June 6, 2012, alleging violations of his rights under the Fourth, Fifth, and Fourteenth Amendments to the Constitution, as well as the New York State Constitution, and advancing claims of false arrest and malicious prosecution, all in connection with his June 11, 2010 arrest and June 13, 2010 presentment.  (Dkt. #1).  Among other things, Plaintiff contended that he had been charged on June 13, 2010, "[b]ased on the mere fact that a resident/some residents of the building recognized Plaintiff," and that the police officers had never obtained a witness statement linking Plaintiff to the incident.  (Compl. ¶¶ 22, 23).  Since there was no witness statement, Plaintiff reasoned, he "could not be indicted and was not indicted for the crimes."  (Compl. ¶ 24; *see also id.* ¶ 26 ("Without a complainant with admissible evidence to link Plaintiff to the alleged burglary/robbery, the Police Officers lacked probable cause to seek the arrest of Plaintiff and to have him arrested....")).

Defendant City moved for a judgment on the pleadings on June 17, 2013.  (Dkt. #15).  The Court held oral argument on that motion on August 20,

---

reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation.").

2013, and noted at that conference that Defendant had submitted materials beyond what the Court could properly consider in a motion for judgment on the pleadings, *viz.*, the evidence related to the identification of Plaintiff as the man in the videotape. (August 20, 2013 Transcript ("Aug. 20 Tr.") 2). As such, the Court notified the parties of its intention to convert the motion for judgment on the pleadings to one for summary judgment. (*Id.*).

Defense counsel raised the possibility of introducing a stipulation from Plaintiff that he was in fact the man in the videotape. (Aug. 20 Tr. 13). When the Court asked Plaintiff's counsel whether his client was indeed the man in the videotape, counsel replied that he did not know because he had never met his client in person. (*Id.* at 15-16). Nor had counsel made arrangements for Plaintiff, currently incarcerated, to see the videotape, even though it was an essential piece of evidence that had been incorporated by reference in Plaintiff's Complaint. (*Id.* at 16). Counsel also conceded that because he had never met Plaintiff, he had carefully drafted the Complaint to elide the issue of whether Plaintiff was the man in the videotape. (*Id.* at 17-18).

In light of these admissions, the Court ordered Plaintiff's counsel to show his client the videotape in question and to notify the Court as to whether Plaintiff planned to contest his identification as the man in the videotape. (Aug. 20 Tr. 22-23). On October 24, 2013, Plaintiff's counsel notified the Court that his client was the man in the videotape. (Dkt. #25).

Subsequently, at a conference held on November 1, 2013, the Court asked the parties what discovery or supplemental briefing they required before

proceeding to summary judgment.  Neither party wished to reopen discovery
fully, and neither party sought to supplement the briefing.  Plaintiff waived the
right to additional discovery and sought to have the motion decided on the
record as it stood.[7]  Defendant sought to submit a declaration from Detective
Opalick.  (November 1, 2013 Transcript ("Nov. 1 Tr.") 11).

Defendant submitted that declaration on November 8, 2013 (Dkt. #28),
and Plaintiff did not respond to, much less controvert, any facts averred in that
Declaration.  The Court now considers the motion for judgment on the
pleadings, which it converts to one for summary judgment.

## DISCUSSION

**A.    The Standard of Review**

### 1.    Conversion of a Rule 12(c) Motion to a Rule 56 Motion

Rule 12(d) of the Federal Rules of Civil Procedure provides, "If, on a
motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are
presented to and not excluded by the court, the motion must be treated as one
for summary judgment under Rule 56.  All parties must be given a reasonable

---

[7]     Plaintiff's counsel initially stated that "[m]y client is not basically willing or able to start
spending money to conduct depositions.  He would be willing to stipulate that the Court
make a decision on the record as it is now, if that is enough for the Court to make a
decision." (Nov. 1 Tr. 4-5).  Counsel later stated that

> plaintiff doesn't want to invest much more resources on the matter at
> this time. If in fact the detective would say that and that is what
> happened, plaintiff will really have no position to the Court considering
> such an affidavit in converting the case from a motion to dismiss to a
> summary judgment motion.  On our part, we are not going to be
> submitting any further papers and we will rely on what we already
> submitted.

(*Id.* at 6).  Still later in the conference, counsel reiterated that "as counsel, based on
where I think the case is, hopefully I wouldn't have to do anything else." (*Id.* at 12).

9

opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). Thus, a district court may convert a motion for judgment on the pleadings into a motion for summary judgment when the motion presents matters outside the pleadings, but the court must give "sufficient notice to an opposing party and an opportunity for that party to respond." *Groden* v. *Random House, Inc.,* 61 F.3d 1045, 1052 (2d Cir. 1995).

"Care should, of course, be taken by the district court to determine that the party against whom summary judgment is rendered has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried, and that the party for whom summary judgment is rendered is entitled thereto as a matter of law." *Ramsey* v. *Coughlin*, 94 F.3d 71, 73-74 (2d Cir. 1996) (quoting 6 James W. Moore, Moore's Federal Practice ¶ 56.12, at 56-165 (2d ed. 1995)).

Defendant City presented matters outside the pleadings in its motion for judgment on the pleadings. Significantly, however, there are no material facts in dispute; indeed, Plaintiff has not controverted any facts put forth by Defendant. The Court provided notice of its intention to convert the motion at the August 20, 2013 conference. At the subsequent November 1, 2013 conference, the parties notified the Court that they did not wish to conduct any further discovery, and that only Defendant sought to supplement the record with an affidavit from Detective Opalick. Accordingly, it is appropriate for the Court to convert the motion to one for summary judgment.

### 2.    Summary Judgment Generally

Under Fed. R. Civ. P. 56(a), summary judgment may be granted only if all the submissions taken together "show[] that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the

pleadings.  *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (internal quotation marks omitted), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles* v. *General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985)).  Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist."  *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher* v. *Atex, Inc.,* 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)).

## B.    Application

### 1.    Plaintiff's Section 1983 Claims for False Arrest and Malicious Prosecution Fail as a Matter of Law

Section 1983 establishes liability for deprivation, under the color of state law, "of any rights, privileges, or immunities secured by the Constitution."  42 U.S.C. § 1983.  Plaintiff here alleges violations of his Fourth, Fifth, and Fourteenth Amendment rights, and brings claims for false arrest and malicious prosecution in connection with his June 11, 2010 arrest and his June 13, 2010 presentment.  A claim for false arrest, under Section 1983 or New York State law, requires a plaintiff to show "that the defendant intentionally confined him without his consent and without justification."  *Weyant* v. *Okst*, 101 F.3d

845, 852 (2d Cir. 1996).  A claim for malicious prosecution, by contrast,
requires, a showing that: (i) the defendant initiated a criminal proceeding;
(ii) that was terminated favorably to the plaintiff; (iii) there was no probable
cause for the criminal charge; and (iv) the defendant acted maliciously.  *See*
*Rothstein* v. *Carriere*, 373 F.3d 275, 282 (2d Cir. 2004) (citing *Savino* v. *City of*
*New York*, 331 F.3d 63, 72 (2d Cir. 2003)); *accord Bernard* v. *United States*, 25
F.3d 98, 104 (2d Cir. 1994).  Since probable cause is a complete defense to
claims of both false arrest and malicious prosecution, the Court considers
whether the NYPD had probable cause to arrest Plaintiff on June 11, 2010.
*See Weyant*, 101 F.3d at 852 (false arrest); *Manganiello* v. *City of New York*,
612 F.3d 149, 161–62 (2d Cir. 2010) (malicious prosecution).

    A police officer has probable cause when he has "knowledge or
reasonably trustworthy information of facts and circumstances that are
sufficient to warrant a person of reasonable caution in the belief that the
person to be arrested has committed or is committing a crime."  *Escalera* v.
*Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (internal quotation marks omitted)
(quoting *Weyant*, 101 F.3d at 852).  The Second Circuit has held that "police
officers, when making a probable cause determination, are entitled to rely on
the victims' allegations that a crime has been committed."  *Martinez* v.
*Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (citing *Singer* v. *Fulton Cnty. Sherriff*,
63 F.3d 110, 119 (2d Cir. 1995)); *see also Curley* v. *Village of Suffern*, 268 F.3d
65, 70 (2d Cir. 2001) (holding that an arrest may be proper "[w]hen information
is received from a putative victim ... unless the circumstances raise doubt as to

the person's veracity" (citing *Singer*, 63 F.3d at 119)); *Miloslavsky* v. *AES Eng'g Soc., Inc.*, 808 F. Supp. 351, 355 (S.D.N.Y. 1992) ("The veracity of citizen complaints who are the victims of the very crime they report to the police is assumed." (citing *Adams* v. *Williams*, 407 U.S. 143, 146-47 (1972))). Furthermore, officers are "not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Martinez*, 202 F.3d at 635 (internal quotation marks omitted) (quoting *Ricciuti* v. *N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997)); *accord Awelewa*, 2012 WL 601119, at *3; *see also Koester* v. *Lanfranchi*, 288 F. App'x 764, 766 (2d Cir. 2008) (summary order) (concluding that an "officer is not required to eliminate every possible line of impeachment that might apply to a victim complainant" (internal quotation marks omitted) (quoting *Krause* v. *Benett*, 887 F.2d 362, 372 (2d Cir. 1989))).

### i.   Probable Cause Existed for Plaintiff's Arrest

The material, non-disputed facts make plain that probable cause existed for Plaintiff's arrest.  The record indicates that, at the time he directed that arrest, Detective Opalick had

- Been assigned to investigate the April 3 attempted robbery incident and had interviewed the victim of that incident (Ex. F at 2; Opalick Decl. ¶ 4);

- Understood that the incident involved two perpetrators, one of whom was male and both of whom were black (Ex. F at 2);

- Become aware that Velvet Volter had been arrested the day the attempted robbery took place (Ex. C; Opalick Decl. ¶ 5; Ex. F at 1, 4-5);

- Learned that, at the time of the attempted robbery, Volter was cohabitating with Plaintiff in the Hotel where the incident took place (Ex. G at 2; Opalick Decl. ¶ 5);

- Become aware that the perpetrators in the videotape had been identified by the Hotel as "Velvet Volter" and "Arthur Johnson" (Compl. ¶¶ 18-21; Ex. G at 2);

- Obtained a picture of Plaintiff from police databases (Opalick Decl. ¶ 5); and

- Reviewed the Hotel's security video footage from the date and time in question, which showed "Volter" and "Johnson" — who matched the victim's description of the perpetrators — walking down the hallway from the victim's apartment at the approximate time of the attempted robbery, followed by the victim (Ex. F at 3; *see also* Ex. B at Camera 12 17:25:47-26:10, Camera 9 17:26:47, Camera 1 17:27:14).  The male perpetrator also matched the photograph of Plaintiff that Detective Opalick had obtained from the police database (Opalick Decl. ¶¶ 6, 9).

All of these facts, taken together, are "sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime," thus establishing probable cause for Plaintiff's arrest.  *See Escalera*, 361 F.3d at 743.

The additional record evidence known to the NYPD at the time of Plaintiff's arrest confirms the Court's conclusion that probable cause existed for that arrest.  This evidence included supplemental information about Velvet Volter; Volter was reported to have admitted in a post-arrest statement that "*we* knocked on the door," thereby corroborating the victim's account of two perpetrators being involved.  (Ex. C at 2 (emphasis added)).  Volter also pled guilty to the offense in May 2010, a month prior to Plaintiff's arrest.  (Ex. D at 3).  In her allocution, Volter confirmed that she assaulted the victim at the time

15

and place of the April 3 robbery, presumably before being caught on video with Plaintiff fleeing down the hallway.  (Ex. B, D).[8]

Plaintiff argues that because the video camera was not fixed directly on the victim's door, there was no probable cause for the arrest.  (Pl. Opp. 3).  This argument is unpersuasive.  The video need not show the actual crime in question in order to support probable cause for arrest.  The camera recorded the area near the victim's door, and showed two perpetrators at or about the time and place of the robbery incident — one of whom pled guilty to assaulting the victim that day and the other of whom was identified by several people as Plaintiff — walking away from the victim's apartment and the victim chasing after them.  Detective Opalick was entitled to credit the victim's account of the crime, particularly when that account was corroborated by the security footage he reviewed and the other information he obtained in the course of his investigation.  *See Martinez*, 202 F.3d at 634.  Even taking the facts in the light most favorable to Plaintiff, the Court holds that no reasonable jury could find that the police lacked probable cause to arrest Plaintiff.

### ii.    Probable Cause Existed for Plaintiff's Prosecution

Because the Court finds that there was probable cause to arrest Plaintiff, in order to prevail on his malicious prosecution claim, Plaintiff must show that the discovery of some intervening fact made the probable cause "dissipate" between the time of the arrest and the commencement of the prosecution.

---

[8]    Since Detective Opalick remained in contact with the ADA responsible for the prosecution of Volter's case, and since Volter's guilty plea occurred one month prior to Plaintiff's arrest, Opalick may well have had actual knowledge of Volter's guilty plea. (*See, e.g.*, Ex. F at 1, 4-5).

*Lowth* v. *Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996) ("In order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact." (citing *Callan* v. *State*, 73 N.Y.2d 731 (1998))).

Plaintiff argues that since the victim was unable to identify the perpetrators, the prosecution was malicious and without probable cause. (Pl. Opp. 4). As Defendant notes, this requires the Court to accept the dubious proposition that there can be probable cause to prosecute only if the victim can identify the attacker. (Def. Reply 2). Though the victim could not identify the perpetrators, her account was corroborated by other evidence, which, taken together, established probable cause for the prosecution. Quite simply, no intervening fact was discovered between Plaintiff's arrest and prosecution that made the charges against him appear groundless. Therefore, Plaintiff's malicious prosecution claim fails.

### 2.   Plaintiff Has Failed to State a *Monell* Claim

Plaintiff has also failed to state a claim for municipal liability under *Monell* v. *Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Significantly, "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal* v. *City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (citing *Monell*, 436 U.S. at 694). Because Plaintiff's potential claims against the City of New York presuppose the

existence of an independent constitutional violation, and because this Court
has found that none has been identified, Plaintiff's *Monell* claims must be
dismissed.  *See, e.g.*, *Mitchell* v. *Cnty. of Nassau*, 786 F. Supp. 2d 545, 563
(E.D.N.Y. 2011) ("In order to state a viable *Monell* claim … plaintiff must
establish some constitutional violation." (collecting cases)).

### 3. The Court Declines to Exercise Jurisdiction over Plaintiff's Remaining State Law Claims

As Johnson's federal law claims have been dismissed, the Court declines
to exercise jurisdiction over his state law claims.  *See Kolari* v. *N.Y.-
Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (holding that if no federal
claims remain for trial, a court may decline to exercise supplemental
jurisdiction over state law claims (citing 28 U.S.C. § 1367(c)(3))).

### CONCLUSION

Since there was no underlying Constitutional violation, the Court finds
that it would be futile for Plaintiff to amend the Complaint to add the names of
the John Doe police officers.  Accordingly, the motion for summary judgment is
GRANTED.  The Clerk of Court is directed to terminate Docket Entry number
15 and to close the case.

SO ORDERED.

Dated: November 25, 2013
       New York, New York

_____
    KATHERINE POLK FAILLA
    United States District Judge